Kenneth McQUAID, Appellant,

v.

UNITED STATES of America

v.

KEYSTONE DRYDOCK & SHIP REPAIR CO.

No. 14799.

United States Court of Appeals Third Circuit.

Argued May 22, 1964.

Decided Oct. 28, 1964.

George W. Hoft, Zink, Shinehouse & Holmes, Philadelphia, Pa., for appellant.

Morton Hollander, U. S. Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., David M. Satz, Jr., U. S. Atty., J. F. Bishop, Atty., Dept. of Justice, Washington, D. C., for appellee United States; Sidney McCord, Jr., Haddonfield, N. J., for impleaded appellee Keystone Drydock & Ship Repair Co., on the brief), for appellees.

Before KALODNER, GANEY and SMITH, Circuit Judges.

GANEY, Circuit Judge.

Suit was here instituted by the libelant, who was a shore side employee of the Keystone Drydock & Ship Repair Co., in the District Court for the District of New Jersey, by a libel in personam against the United States, as owner of the vessel, U.S.S. Nantahalla, who, in turn, impleaded the Keystone Drydock & Ship Repair Co., under Admiralty Rule 56.

The libel alleged liability on the part of the United States that the vessel and its appurtenances were unseaworthy, and, in the alternative, that the United States was negligent in failing to provide the libelant with a safe place to work.

The court below held that the warranty of seaworthiness did not apply to the libelant, by reason of the fact that the vessel was in control of the contractor undergoing extensive repairs and was not in maritime navigation and, additionally, that the libelant was not engaged in work traditionally done by seamen. With respect to the charge of negligence, the court held that there was a failure to establish the same, in view of the absence of any evidence that the instrument which occasioned his injuries was under the control and operation of the defendant.

The court below, in dismissing the libel, made Findings of Fact and Conclusions of Law which cannot be said to be clearly erroneous and, accordingly, the judgment of the lower court will be affirmed.

Briefly, the facts upon which the libelant predicated unseaworthiness and

negligence on the part of the United States are as follows: The libelant, who resided at 211 Bailey Street, Camden, New Jersey, was a shore side mechanic and was employed on July 9, 1958, by the Keystone Drydock & Ship Repair Co. The alleged accident occurred about 3:00 o'clock in the afternoon of that date, when his foreman told him to go below and cut out the seat of a pump. He proceeded with his tools, down a set of stairs, turned to the right and went out under a short set of stairs at the bottom of which, a little to the right, was a pump that he was to repair. When he came to the bottom of the stairs, he noticed two men working on a staging, whom he described as sailors, by reason of the fact that they wore dungarees, blue shirts and white Navy caps. There was another sailor on the starboard side of the ship, standing in a corner, as well as another sailor whom he noticed as he came down the steps. The libelant testified he did not know what these men were doing, but that two of them were on the staging. The staging was an eight inch plank, two inches thick and some eight to ten feet long and the room in which the staging was located, was approximately twenty to twenty-five feet and the pump was to the right of the stairs along the starboard side of the ship. He said that he knelt down with his equipment on the left side of the pump and that the plank was about one foot to the left of his head and about six feet above him and that it was about twelve to fourteen feet from the deck to the ceiling at the top of the room.

The record is barren of any evidence as to how the "staging" was set up, whether it hung from the ceiling or was supported from the deck in the room. Furthermore, he had no conversation with the men, especially the two men who had been on the staging, on the plank, about eight inches wide, and that after he entered he did not know where the men on the plank were, when he was hit, but that they were not on the plank, and that he did not believe they were in the same room where he was working,

all very difficult of belief, especially for two men to be standing on an eight inch plank. He first saw the plank on the floor after he was hit and believed it was the same plank which was some six feet above him and upon which the two men were working. He stated he had chiseled the cylinder in the pump in order to cut out the seat and had broken two chisels and was working with the third when something struck him on the head; that he was knocked out for a minute or two, and believes when he started to get up he inquired of a man standing by him, "What blew up?" and the man, whom he claims was a sailor, said, "You were hit by that plank." This man took him to the quarters of the doctor on the ship where he was treated, later sent to the hospital where x-rays were taken of his head and he was sent home where he was later treated by his own physician.

At the time the libelant received these injuries, the U.S.S. Nantahalla was undergoing extensive repairs from the middle of April, until the 12th day of July, and, while thus out of service, received her energy, power and utilities from the shore through the services of the impleaded-respondent, Keystone Drydock & Ship Repair Co. On the 9th of July the vessel was removed from the dock, drawn by tugs and moored starboard side to the dock of Keystone Drydock & Ship Repair Co., and it was on this day, in the middle of the afternoon, that libelant was injured. Three days later, on July 12, the Nantahalla left the Keystone yards, the date called for its completion by the contract specifications. The trial court found and the record cannnot, in any wise, be said to dispute the fact, that at all times while it was in the drydock undergoing extensive repairs and overhauling, which were in excess of $1,000,-000, the ship was in the complete control of the ship's contractor, the Keystone Drydock & Ship Repair Co., the crew thereof being berthed in dormitories, shore side, and all of their meals were taken off the ship since the extensive alterations being done included repairs and

construction to the berths of the ship's crew.

The court likewise found that the work the libelant was performing with the air hammer and chisels was under the control and direction of the contractor, Keystone Drydock & Ship Repair Co. and, here again, there was nothing in the record which would contradict the same.

The jurisdiction of the subject matter is conferred under the Public Vessel Act, 46 U.S.C. 781 et seq.

■■ With respect to the contention of the libelant that the vessel was unseaworthy, while it has been held in many instances, such as Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, that there is a duty imposed upon a shipowner to supply a seaworthy vessel, not only to its immediate crew members, but to all who performed services on the ship traditionally rendered by seamen, this doctrine is inapplicable in our case. Here, the plaintiff was a shore side, boilermaker, employed by the Keystone Drydock & Ship Repair Co., and he came to work on board the Nantahalla, undergoing extensive repairs and overhauling which were done to the ship preparatory to getting it back into service. The work that the libelant was performing was not something which bore any resemblance to maritime navigation, as in the Sieracki case, supra, where there was loading and unloading of a ship, or in the Pope & Talbot case, supra, where a carpenter was repairing grain loading equipment on a ship in active navigation. The facts here are, in no wise, similar. As has been indicated, the crew was not aboard because of the extensive alterations being done and the Keystone Drydock & Ship Repair Co. was in complete control of the ship. Where a vessel is not in maritime service, but is undergoing a complete overhauling, as well as where it is not in control of the owner or operator, the protection against the unseaworthiness of the ship, as to shore base workers, is withheld. Roper v.

United States, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1; West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161; United New York & New Jersey Sandy Hook Pilots Association et al. v. Halecki, Admrx., 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541; Allen v. United States, D.C., 178 F.Supp. 21.

■ The charge of negligence against the United States likewise falls as the libelant has failed to sustain his burden of proof first in not showing exactly how the accident occurred. While we may infer or even accept libelant's statement that he was struck on the head by a plank which was overhead, inasmuch as there was nothing to show, as we have indicated, the construction of the staging, who put it there, or what work was being performed by the men allegedly on the plank, eight inches in width, or under whose supervision they were working, there is, accordingly, absent any proof of negligence on the part of the owner or operator of the vessel. Furthermore, there was direct testimony by an inspector of the Navy who said that no staging apparatus was in the possession of the ship and that the only thing on the ship at the time was damage gear.

The libelant makes mention of the exclusion of certain testimony offered by a sailor who was on the stairs or at least in the immediate vicinity of the pump when the libelant was injured. The record discloses that the libelant said, "What blew up?" and a man responded that, "You were hit on the head by that plank." This testimony was excluded by the trial judge as not being part of res gestae, even though it was an utterance by one immediately after the libelant alleged he was struck. However, whether it was admissible or not, we need not decide here. Assuming it was admissible, there was nothing to show how the plank came to strike the libelant, what the nature of the construction of the "staging" was or, as we have indicated, who controlled it, and in whose services the men working on it were engaged and, accordingly, by no stretch of the imagination, could negligence be

inferred against the United States on the meager record before us.

Accordingly, the rule that the Findings of Fact of the trial judge can be set aside only when they are clearly erroneous is applicable. On this record we cannot so find, therefore, the judgment of the trial court will be affirmed.